**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

TIN UDOVICIC, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

Case No.: 2:26-cv-12731

v.

**COMPLAINT AND JURY TRIAL DEMANDED**

WALMART, INC.,

Defendant.

________________________________/

**COMPLAINT**

Plaintiff Tin Udovicic ("Plaintiff") on behalf of himself and all others similarly situated, by and through undersigned counsel, bring this action against Defendant Walmart, Inc. ("Defendant"). The allegations contained herein, which are based on Plaintiff's knowledge of facts pertaining to themselves and their own actions and counsel's investigations, and upon information and belief as to all the other matters, are as follows:

## I. INTRODUCTION

1. This action is brought on behalf of Plaintiff, and others similarly situated, that purchased goods sold by Defendant throughout the United States, who bore the economic burden of the President Donald Trump ("Trump") Administration's tariffs, imposed under the International Emergency Economic Powers Act ("IEEPA") (50 U.S.C. § 1701, et seq.), and against Defendant who shifted the economic burden of the IEEPA tariffs to consumers throughout the United States by increasing prices on imported goods as well as U.S.-sourced goods not subject to tariffs. Defendant now receives an inequitable windfall by collecting refunds from the federal

government for tariff costs that were shifted to and paid by Plaintiff, who purchased goods from Defendant, and therefore, is the real party in interest to receive the IEEPA tariff refunds.

2. Defendant collected hundreds of millions of dollars in unlawful tariffs from consumers by raising prices on imported goods and U.S.-sourced goods while the tariffs imposed by the Trump Administration under IEEPA were in effect.

3. The refund process set in place by the federal government when the United States Supreme Court struck down the IEEPA tariffs established that ***only*** the importer of record ("IOR") is entitled to apply for and receive a refund for any money paid for the import of goods. However, Defendant shifted the cost of these tariffs to its customers by way of price increases to products subject to tariffs and items not subjected to tariffs, being Plaintiff and similarly situated consumers those who truly bore the tariff costs in the first place.

4. Defendant has not returned ***any*** portion of those costs it passed on to consumers, and it has no intention of doing so. It has, in short, generated and retained a windfall from unlawful government action, and consumers—not Defendant—are the ones left paying for it.

5. This dispute arises from a fundamental inequity in the tariff refund process. Only the importer of record may seek a refund for an unlawfully assessed tariff—but importers merely advance the tariff cost at the border and recoup all or a substantial part of it through higher consumer prices. In economic reality, the end-consumer paid the illegal tariff.

6. This inequity is compounded when, as here, a tariff is struck down by the courts. Consumers who bore the true economic burden have no direct avenue for redress—they both lack a statutory cause of action in the Court of International Trade and standing to seek a refund. That right belongs exclusively to the importer of record, here Defendant, regardless of who actually paid. The refund process as designed, establishes that large corporations that passed the entire tariff

cost onto their customers remain exclusively entitled to recover a full refund of tariffs the Supreme Court has since declared unlawful.

7. This lawsuit seeks to force Defendant to return funds collected from millions of consumers to cover IEEPA tariffs between February 4, 2025 and February 20, 2026 ("Class Period"). Defendant has made no commitment to compensate consumers for those payments. This act not only does not reimburse the consumer for the portion of the unlawful tariff that was forced upon him by the Defendant by means of across-the-board price increases, but it also unfairly enriches Defendant at the expense of the consumer.

8. Plaintiff seeks a judgment that requires Defendant to return to Plaintiff all IEEPA duties passed on to customers in the form of higher prices on products, with interest.

9. Plaintiff also seeks restitution of the tariff overcharges they paid, or a proportionate share of any tariff refunds Defendant recovers, together with interest, reasonable attorneys' fees, and costs.

## II. JURISDICTION AND VENUE

10. This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity exists. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

11. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events, omissions, and misrepresentations giving rise to Plaintiff's claims occurred in this District. Defendant has marketed, advertised, and made available for sale products subject to IEEPA tariffs within this District.

## III. PARTIES

### A. Plaintiff

12. Plaintiff Tin Udovicic is a resident of Springfield, New Jersey. During the Class Period, Plaintiff purchased goods such as groceries and packaged foods and beverages, household products, health and personal-care products, apparel and accessories, home goods, and pet supplies from Defendant. Some or all of these products were imported from countries subject to IEEPA tariffs and sold at prices inflated by Defendant's pass-through of IEEPA tariff costs. Plaintiff also purchased other products that were sourced from within the United States and not subjected to tariffs but were sold at prices Defendant likewise inflated by spreading across its product line the IEEPA tariff costs incurred on its imported goods, so that purchasers of non-tariffed domestic goods also bore the tariff burden.

### B. Defendant

13. Walmart, Inc. is an American national consumer goods company that conducts business in all 50 states. Defendant is a Delaware corporation with principal executive offices located at 1 Customer Drive, Bentonville, Arkansas 72716. Defendant is one of the world's largest retail companies. At all relevant times, Defendant operated a brick and mortar and online store through which it sold imported products and U.S.-sourced products directly to consumers. Between February 4, 2025, and February 20, 2026, Defendant collected tariff costs from those consumers on goods subject to tariffs imposed under the IEEPA as well as goods not subject to tariffs imposed under IEEPA. On information and belief, the misconduct alleged herein originated from and was directed out of Defendant's headquarters and principal place of business in Bentonville, Arkansas. Plaintiff purchased goods from Defendant's brick and mortar retail location

at 4928 State Road 674, Wimauma, FL **33598**, among other items purchased at Defendant's other locations.

## IV. FACTUAL ALLEGATIONS

### A. Defendant is an Enormous Retailer of Imported Good and U.S.-Sourced Goods

14. Defendant is a major retailer that imports a substantial volume of consumer goods into the United States and sells them to consumers throughout the country through both its physical locations and its online store.

15. Defendant purchases the goods it sells wholesale from vendors, suppliers, and manufacturers, including but not limited to, a substantial volume of goods imported from outside the United States, and resells them to consumers in its brick and mortar and online stores. Defendant owns the inventory it offers for sale and sets the retail prices its customers pay.

16. For the imported goods it sells, Defendant's involvement begins before the goods enter the United States. Defendant acts as the IOR who signs the customs declaration, takes legal responsibility for compliance, and pays the tariff to U.S. Customs and Border Protection ("CBP"). On information and belief, Defendant serves as the IOR for a substantial portion of the imported goods it sells.

17. Defendant's product line is not limited to imported goods. Defendant also sources, stocks, and sells a substantial volume of consumer goods that originate within the United States and are not subject to IEEPA tariffs. Defendant offers these U.S.-sourced goods to consumers in its brick and mortar and online stores, alongside its imported goods. As with its imported goods, Defendant owns this inventory and sets the retail prices its customers pay.

18. The IEEPA tariffs increased the costs Defendant incurred on the imported goods for which it serves as the importer of record. On information and belief, rather than absorbing those

increased costs or confining them to the imported goods that generated them, Defendant recovered the tariff costs by raising prices across its product line, including on U.S.-sourced goods that were never subject to IEEPA tariffs.

19. As a result, Defendant sold its imported goods at prices inflated by its direct pass-through of IEEPA tariff costs and sold its U.S.-sourced goods at prices likewise inflated by Defendant's decision to spread those same tariff costs across its product line.

20. Consumers who purchased U.S.-sourced goods from Defendant therefore bore a portion of the IEEPA tariffs that Defendant incurred on imported goods those consumers never purchased.

**B. The Trump Administration Invokes the IEEPA to Implement Tariffs**

21. On February 4, 2025, Trump issued an executive order imposing a 10% tariff on Chinese imports.[1] In March 2025, Trump issued two more executive orders imposing a 25% tariff on goods imported from Canada and Mexico respectively.[2] By April 2025, the Trump Administration had imposed tariffs on imports from most other U.S. trading partners.

22. The Trump Administration invoked IEEPA as the legal basis for these tariffs. The IEEPA was originally designed to allow the President to regulate international commerce during declared national emergencies.[3] The Trump Administration pointed to drug trafficking across U.S. borders and the persistent American trade deficit as the legal emergencies justifying the IEEPA tariffs.[4]

---

[1] Andrea Shalal; Trump launches trade war with tariffs on Mexico, Canada and China. Reuters (Feb. 1, 2025) (https://www.reuters.com/business/trump-readies-order-steep-tariffs-goods-mexico-canada-china-2025-02-01/)
[2] *Id*.
[3] Christopher A. Casey, Library of Congress, R-45618, The International Emergency Economic Powers Act: Origins, Evolution, and Use (https://www.congress.gov/crs-product/R45618)
[4] Id. at *supra* note 1.

23. The IEEPA tariffs did not operate in isolation. For example, for much of 2025, the effective rate on most Chinese electronics was approximately 45%: a 20% IEEPA layer on top of an already existing 25% Section 301 tariff.[5] At the peak of the escalation in early May 2025, average U.S. tariffs on Chinese imports reached 127.2%.[6]

24. On April 3, 2025, within days of the IEEPA tariffs going into effect, the first lawsuit challenging their legality was filed.[7] Despite palpable fear from business groups of incurring Trump's wrath,[8] other lawsuits would eventually follow.[9] These filings were widely reported and as a major retailer, Defendant certainly tracked their progress.[10]

25. On February 20, 2026, the U.S. Supreme Court issued its opinion in *Learning Resources, Inc. v. Trump* holding that the IEEPA did not authorize the President to impose the IEEPA tariffs and that they were invalid.[11]

26. The Supreme Court's decision in *Learning Resources, Inc*. eliminated the legal basis for the IEEPA tariffs and created a pathway for importers like Defendant to seek refunds of the tariffs previously collected by the federal government.

## C. Consumers Incurred Price Increases on Defendant's Products While the IEEPA Tariffs Were in Effect

[5] Section 301 of the US Trade Act of 1974 authorizes the President to take all appropriate action, including tariffs, to remove a foreign government's practice that violates an international trade agreement and that restricts US commerce. 19 U.S.C. § 2411. Trump implemented Section 301 tariffs in 2018.
[6] Chad P. Bown, US-China Trade War Tariffs: An Up-to-Date Chart, Peterson Institute for International Economics (Nov. 14, 2025) (https://www.piie.com/research/piie-charts/2019/us-china-trade-war-tariffs-date-chart)
[7] *Emily Ley, Paper, Inc., d/b/a Simplified v. Trump*, No. 3:25-cv-464-TKW-ZCB (N.D. Fla. Apr. 3, 2025).
[8] Caitlin Oprysko¸ 'Everyone is terrified': Business and government officials are afraid to cross Trump on tariffs, Politico (Apr. 4, 2025) (https://www.politico.com/news/2025/04/04/trump-tariffs-fear-lobby-business-congress-00006608)
[9] See. e.g. Doug Palmer¸ Trump's tariffs could face more than one legal challenge, Politico (Apr. 3, 2025), (https://www.politico.com/news/2025/04/04/first-lawsuit-filed-against-trumps-tariffs-00273646) Larry Neumeister, A dozen states sue the Trump administration to stop tariff policy, Associated Press (Apr. 23, 2025) (https://apnews.com/article/tariffs-lawsuit-what-states-sue-0d6531b7f60aaa2f7c6c35e0a944d4a9)
[10] *Id*.
[11] *Learning Resources, Inc. v. Trump*, 607 U.S. ___, 146 S. Ct. 628 (2026) (slip op. at 20).

27. The IEEPA tariffs increased the costs that retailers, including Defendant, incurred on imported goods. Across the retail industry, companies responded by passing those increased costs on to consumers through higher prices. A survey of U.S. CEOs found that a majority had already raised prices or were considering doing so in response to the tariffs,[12] and major retailers publicly announced tariff-driven price increases throughout 2025 and into 2026.[13]

28. Independent economic analysis confirms that a substantial portion of the tariff costs was passed through to U.S. consumers during the relevant period. The Federal Reserve found that pass-through to consumers for goods imported from China was at least 30 percent between April and December 2025.[14] Federal Reserve Bank of New York research found that U.S. businesses and consumers together bore nearly 90 percent of the cost of the 2025 tariffs.[15]

29. These price increases were not confined to imported goods. Analyses of retail pricing found that prices rose on both imported and domestically produced goods as retailers spread tariff-related costs across their product lines.[16] Researchers estimated that tariff pass-through added roughly 0.7 percentage points to the Consumer Price Index by September 2025, and that the lowest-priced product varieties saw the steepest increases (around 5 percent) because retailers had the least room to absorb the cost in their margins.[17]

---

[12] *Here Are the Retailers Raising Prices as Trump Tariffs Take Hold*, CNBC (May 31, 2025), (https://www.cnbc.com/2025/05/31/trump-tariffs-here-are-the-retailers-raising-prices.html) (reporting the Chief Executive Group/AlixPartners survey of U.S. CEOs and individual retailer price-increase announcements).

[13] Megan Cerullo, *Walmart and Other Big Companies Say Tariffs Are Forcing Them to Hike Prices*, CBS News (Feb. 20, 2026) (https://www.cbsnews.com/news/walmart-trump-tariffs-general-merchandise-inflation/)

[14] *The Slow Climb: How Tariffs Gradually Raised Retail Prices in 2025*, Bd. of Governors of the Fed. Reserve Sys., FEDS Notes (Mar. 5, 2026) (https://www.federalreserve.gov/econres/notes/feds-notes/the-slow-climb-how-tariffs-gradually-raised-retail-prices-in-2025-20260305.html)

[15] Cerullo, *Walmart and Other Big Companies*, supra (reporting Federal Reserve Bank of New York research that U.S. businesses and consumers together bore nearly 90% of the cost of the 2025 tariffs).

[16] *Are Tariffs Raising U.S. Retail Prices?* (updated), Econofact (Dec. 5, 2025) (https://econofact.org/are-tariffs-raising-u-s-retail-prices) (summarizing the Cavallo/Harvard Business School Pricing Lab analysis of online pricing at five major U.S. retailers, including price increases on domestically produced goods).

[17] *Id.*

30. The cumulative burden on consumers was enormous. After years of moderating prices, consumer goods prices rose throughout 2025 and into 2026.[18] According to the Budget Lab at Yale University, tariffs accounted for an estimated 86% of the rise in prices for imported household goods, with the effect most pronounced for long-lasting durable goods such as cars, appliances, and furniture.[19] American consumers paid more than $231 billion in tariff costs between February 2025 and January 2026, an average of roughly $1,745 per family.[20]

31. Defendant's product line is not limited to imported goods. Defendant also sources, stocks, and sells a substantial volume of consumer goods that originate within the United States and are not subject to IEEPA tariffs, which it offers to consumers alongside its imported goods. As with its imported goods, Defendant owns this inventory and sets the retail prices its customers pay.

32. The IEEPA tariffs increased the costs Defendant incurred on the imported goods for which it serves as the importer of record. On information and belief, rather than absorbing those increased costs or confining them to the imported goods that generated them, Defendant (like other major retailers) made a business decision to recover the tariff costs by raising prices across its product line, including on U.S.-sourced goods that were never subject to IEEPA tariffs.

33. As a result, Defendant sold its imported goods at prices inflated by its direct pass-through of IEEPA tariff costs and sold its U.S.-sourced goods at prices likewise inflated by its decision to spread those same tariff costs across its product line. Consumers who purchased U.S.-

---

[18] Yale Budget Lab, *Tracking the Economic Effects of Tariffs* (https://budgetlab.yale.edu/research/tracking-economic-effects-tariffs)
[19] *Id.*
[20] *American Families Have Paid More Than $1,700 Each in Tariff Costs Since Trump Entered Office*, Joint Economic Committee Minority (Feb. 2026) (https://www.jec.senate.gov/public/_cache/files/7cc03e65-d40a-465f-9e88-09dd53d3502f/jec-fact-sheet-on-cost-of-tariffs-for-families-update.pdf)

sourced goods from Defendant therefore bore a portion of the IEEPA tariffs that Defendant incurred on imported goods those consumers never purchased.

34. Defendant maintains detailed transaction, pricing, and customer records, including point-of-sale data, online order histories, and payment and loyalty-program records, through which Defendant is able to identify the consumers who paid tariff-inflated prices during the Class Period and the amount of the increase attributable to the IEEPA tariffs.

35. Within weeks of the IEEPA tariffs taking effect, Defendant stated that it could not absorb the tariff costs and that consumer prices would rise as a result. Douglas McMillon ("McMillon"), Defendant's CEO at the time, stated: "We will do our best to keep our prices as low as possible. But given the magnitude of the tariffs, even at the reduced levels announced this week, we aren't able to absorb all the pressure given the reality of narrow retail margins."[21] He summarized the point without qualification later in the same remarks: "even at the reduced levels, the higher tariffs will result in higher prices".[22]

36. McMillon confirmed that tariffs across Defendant's major import markets were already creating cost pressure, that the pressure began in late April, 2025 and accelerated in May, 2025, and that the China tariffs had the largest impact:

> The merchandise that we import comes from all over the world from dozens of countries. Other than the US, the other large markets are China, Mexico, Vietnam, India, and Canada. China, in particular, represents a lot of volume in certain categories like electronics and toys. All of the tariffs create cost pressure for us, but the larger tariffs on China have the biggest impact. The cost pressure from all the tariff impacted markets started in late April, and it accelerated in May.

*Q1 2026 Earnings Call Transcript*, Walmart, Inc., at 5. May 15, 2025

[21] *Q1 2026 Earnings Call Transcript*, Walmart, Inc., at 4. May 15, 2025.
[22] *Id.* at 4-5.

37. McMillon further described Defendant's approach to the tariffs, indicating that the company's pricing and sourcing decisions would be made across items, categories, and businesses rather than item by item: "In some cases, we'll absorb costs within a category or department and not simply pass on a tariff cost attributable to each item individually. We'll be managing mix across items, categories and businesses."[23] Upon information and belief, Defendant also raised prices on U.S.-sourced goods that were not subject to the IEEPA tariffs in order to absorb and recover tariff costs incurred on imported merchandise, with the result that consumers purchasing non-tarrifed U.S.-sourced products paid a share of tariffs assessed on goods they never purchased.

38. Defendant's CFO John Rainey cautioned investors that "[t]he level and speed at which tariff-impacted prices could go up is more extreme than in normal periods."[24]

39. Defendant paid the IEEPA duties directly, at the border, as the goods entered the United States. McMillon explained the mechanics to investors: "When you have an imported item, you pay the tariff at the time it comes through customs. And so the cost is higher, even if the tariff rate comes down later, the cost has been elevated."[25]

40. Defendant was the importer of record for merchandise it sold to Plaintiff and the Class. As importer of record, Defendant was the party that paid IEEPA duties to U.S. Customs and Border Protection at the time the goods entered the United States, and Defendant paid those duties.

> ***Gain Contingencies***
>
> The Company engaged in the process established by the U.S. Customs and Border Protection ("CBP") for refunds of tariffs that the Company paid as the importer of record under the International Emergency Economic Powers Act. The Company accounts for such refunds as gain contingencies and recognizes any recovery when the gain is realized or realizable and the related contingencies have been substantially resolved. During the quarter ended July 31, 2026, the Company received approximately $2.9 billion in tariff refunds, primarily in the Walmart U.S. segment, which were recorded as a reduction to cost of sales and represent substantially all of the refunds requested by the Company.

---

[23] *Id.* at 5.
[24] *Id.* at 8.
[25] *Id.* at 21.

*Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.*

*Walmart, Inc., for the period ended July 31, 2026.*[26]

41. Defendant filed for tariff refunds with the CBP and up to date has recovered $2.9 billion in tariff refunds.

42. Defendant has not established, announced, or offered any process by which Plaintiff or any Class member may obtain a refund of the tariff costs they paid. Defendant has not invited claims and has not returned any portion of the $2.9 billion of the tariff refunds they received from CBP.

43. Plaintiff and Class members paid tariff-inflated prices to Defendant during the Class Period. Defendant now seeks to retain the benefit of those consumer payments while also recovering, and keeping for itself, the government's refund of the same tariffs

**D. Defendant will receive an unjust windfall from IEEPA Tariff Refunds**

44. Following the Supreme Court's decision in *Learning Resources*, nearly 2,000 importers began attempting to recover tariff refunds from the federal government. On March 4, 2026, the Court of International Trade ordered refunds of IEEPA tariffs, holding that "[a]ll importers of record" are "entitled to the benefit" of the Supreme Court ruling that struck down the IEEPA tariffs.[27] The Court ordered CBP to liquidate any and all unliquidated entries subject to IEEPA tariffs "without regard to IEEPA duties," and ordered that "[a]ny liquidated entries for which liquidation is not final shall be reliquidated without regard to IEEPA duties."[28]

45. The Executive Director of CBP's Trade Programs Directorate estimated that as of March 4, 2026, the total amount of IEEPA duties and estimated duty deposits collected pursuant

[26] Retrieved from: https://www.sec.gov/Archives/edgar/data/104169/000010416926000154/wmt-20260731.htm
[27] *Atmus Filtration, Inc. v. United States*, No. 1:26-01259, Order at 1 (U.S. Ct. Int'l Trade Mar. 4, 2026), ECF No. 21.
[28] *Id* at 2-3

to IEEPA is approximately $166 billion.[29] Given Defendant's size, Defendant is likely entitled to collect hundreds of millions of dollars in refunds on behalf of consumers.

46. Despite being well aware of the numerous challenges to the legality of the IEEPA tariffs, Defendant deceived consumers by not informing consumers that it would not refund duties paid by consumers to cover IEEPA tariffs even if they were later invalidated.

47. These funds were wrongfully taken from consumers to cover IEEPA tariffs that have since been invalidated.

## V. CLASS ALLEGATIONS

48. Plaintiff brings this action on behalf of himself, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking damages and injunctive relief pursuant to federal and state law on behalf of the members of the following Class:

a. **Imported Product Subclass**: All persons who, during the period beginning on February 4, 2025 through February 20, 2026, purchased from Defendant a good that was itself subject to IEEPA tariffs, at a price that Defendant increased to pass through the IEEPA tariffs assessed on that good.

b. **US-Sourced Product Subclass**: All persons who, during the period beginning on February 4, 2025 through February 20, 2026, purchased from Defendant a U.S.-sourced good that was not itself subject to IEEPA tariffs, at a price that Defendant increased to spread, recover, or offset across its product line the IEEPA tariff costs it incurred on its imported goods.

[29] Atmus, ECF No. 31 at 6.

49. Excluded from the Class are the Defendant and its officers, directors, management, employees, subsidiaries, or affiliates. Also excluded are the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members, judicial officers and their personnel, and all governmental entities.

50. The identity of all products encompassed within the Class definition, i.e., Class Products, are readily identifiable from Defendant's records. The identity of Class members and their purchase records are available through multiple sources, including Class members' own transaction and payment records, Defendant's records of Class Product purchases, and records maintained by PayPal, credit card companies, and other financial institutions.

51. **Numerosity**. Members of the Class are so numerous that joinder is impracticable. Plaintiff believes that there are tens of millions of members of the Class (if not more), geographically dispersed throughout the United States, such that joinder of all Class members is impracticable.

52. **Typicality**. Plaintiff's claims are typical of the claims of other Class members. The factual and legal bases of Defendant's liability are the same and resulted in injury to Plaintiff and all other members of the proposed Class.

53. **Adequate representation**. Plaintiff will represent and protect the interests of the proposed Class both fairly and adequately. They have retained counsel competent and experienced in complex class-action litigation. Plaintiff has no interests that are antagonistic to those of the proposed Class, and his interests do not conflict with the interests of the proposed Class members they seek to represent.

54. **Commonality**. Common questions of law and fact predominate over questions that may affect only individual Class members because Defendant has acted on grounds generally

applicable to the Class and because Class members share a common injury. Determining damages on a class-wide basis is therefore appropriate. The overcharge injuries incurred by Plaintiff and each Class member arose from the same conduct alleged herein.

55. There are common questions of law and fact specific to the Class that predominate over any questions affecting individual members, including:

a. Whether the higher prices that consumers paid for products sold by Defendant are attributable to the cost of IEEPA tariffs;

b. Whether Defendant is obligated to return the cost of IEEPA tariffs to the consumers who paid them in the form of higher prices;

c. Whether Defendant's retention of elevated consumer payments constitutes unjust enrichment;

d. Whether Defendant's use of IEEPA tariff-related funds to benefit Defendant's business and political interests was unlawful;

e. Whether Defendant acted unlawfully by upcharging consumers in response to IEEPA tariff-related costs while making statements to the contrary;

f. Whether Defendant's conduct constitutes an unlawful practice under consumer protection statutes by collecting tariff-related surcharges from consumers while misrepresenting its pricing practices and failing to establish a consumer refund mechanism;

g. Whether Defendant's conduct has harmed Plaintiff and the Class uniformly; and

h. The measure of damages available to Plaintiff and the Class due to increased prices caused by Defendant's IEEPA tariff pass-through.

56. Prevention of inconsistent or varying adjudications: Individual prosecution of the claims alleged herein would likely yield inconsistent or varying results, establishing incompatible standards of conduct for Defendant. Certification of the proposed Class would prevent this outcome.

57. **Injunctive Relief**. By way of its conduct described in this complaint, Defendant has acted on grounds that apply generally to the proposed Class. Accordingly, final injunctive relief is appropriate respecting the Class as a whole.

58. **Predominance and superiority**. A class action is superior to other available means for the fair and efficient adjudication of the Class's claims. The damages suffered by individual Class members are relatively small compared to the burden of individual prosecution of this complex litigation. Individual lawsuits would risk inconsistent judgments and increase delay and expense for all parties. A class action presents fewer administrative difficulties. Class members are ascertainable through methods typical of class action practice, including Defendant's own records and consumer's proof of purchase.

## VI. CLAIMS FOR RELIEF

### COUNT I – VIOLATION OF THE NEW JERSEY CONSUMER PROTECTION LAW New Jersey Consumer Fraud Act "NJSA" N. J. Stat. § 56:8-2

59. Plaintiff incorporates by reference all preceding allegations fully set forth herein.

60. Plaintiff brings this Count individually and on behalf of all New Jersey Class members.

61. The statute prohibits unfair, deceptive, or abusive acts or practices in business, trade, commerce, or service provision in New Jersey State.

62. Defendant's acts complained of herein are a per se violation of the New Jersey

consumer protection law as these tariffs were illegal and unlawful.

63. Defendant's practices, as alleged herein, are injurious to the public interest as they have the capacity to injure other persons, including the millions of consumers who shop on Defendant's stores.

64. Defendant's deceptive and unlawful acts, as alleged herein, directly and proximately injured Plaintiff and the Class in their business or property. The increased charges to Plaintiff and the Class were the result of illegal tariffs, and the retention of sums gained through illegal collection is a per se violation of the NJSA. Defendant unfairly charged consumers inflated prices to offset those tariff costs while failing to disclose that consumers, rather than Defendant, were bearing the economic burden of those tariffs through increased retail prices. Defendant further failed to disclose that it intended to retain the benefit of any tariff refunds it recovered despite having previously passed the tariff costs on to consumers. These omissions and practices were material to Plaintiff's and the Class's purchasing decisions and if not for Defendant's deceptive and unfair conduct, Plaintiff and the Class would not have purchased products from and sold by Defendant.

65. Defendant's deceptive and unlawful acts and practices complained of herein affected the public interest and consumers at large throughout the Class Period, impacting Plaintiff and similarly situated consumers who purchased products from and sold by Defendant during that time.

66. Defendant is liable to Plaintiff for damages in amounts to be proven at trial, including statutory and treble damages, injunctive relief, as well as attorneys' fees, costs, and any other remedies the Court may deem appropriate under N. J. Stat. § 56:8-2.

**COUNT III – UNJUST ENRICHMENT**

67. Plaintiff incorporates by reference all preceding allegations in paragraphs 1 through 58 as though fully set forth herein.

68. Plaintiff brings this Count on behalf of all Class members.

69. Plaintiff and the Class have conferred a benefit upon Defendant in the form of money paid through tariff-inflated prices on goods during the period February 4, 2025, through February 20, 2026.

70. Defendant received and accepted that benefit and was thereby enriched. Defendant has retained the benefit conferred by Plaintiff without paying or otherwise compensating Plaintiff for its value.

71. The circumstances surrounding Defendant's receipt and retention of this benefit make it unjust and inequitable for Defendant to retain it without payment to Plaintiff. Defendant obtained these funds through price increases on goods subject to unlawful tariffs and has retained the resulting profits.

72. Under principles of equity and good conscience, Defendant should not be permitted to retain those ill-gotten profits when Defendant is seeking a refund of the duties it paid.

73. Plaintiff and the Class are entitled to full disgorgement and restitution of any money Defendant has retained as a result of the unlawful and/or wrongful conduct alleged herein.

**COUNT IV – MONEY HAD AND RECEIVED**

74. Plaintiff incorporates by reference all preceding allegations in paragraphs 1 through 58 as though fully set forth herein.

75. Plaintiff brings this Count on behalf of all Class members.

76. Defendant received funds from Plaintiff and from each member of the putative Class in the form of an IEEPA tariff surcharge. The Supreme Court has determined that the IEEPA tariffs were unlawful.

77. The funds belonged to Plaintiff and to each member of the putative Class.

78. Defendant has not returned the funds. Under principles of equity and good conscience, Defendant should not be permitted to retain those ill-gotten funds. Plaintiff seeks the return of the funds in an amount to be proven at trial.

79. Plaintiff seeks all remedies available under the law, including, if available, actual damages, nominal damages, compensatory damages, punitive damages, and injunctive relief, and other remedies available to them.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of members of the Class, respectfully requests that the Court enter judgment in their favor and against Defendant, as follows:

A. Certification of the proposed Class, including appointment of Plaintiff's counsel as Class Counsel;

B. An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged herein;

C. Declaratory relief that Defendant must return to Plaintiff and the Proposed Class Members all funds paid by consumers to cover a IEEPA tariff surcharge, with interest;

D. Costs, restitution, damages, including punitive damages, and disgorgement in an amount to be determined at trial;

E. An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;

F. An award of costs and attorneys' fees; and

G. Such other or further relief as may be appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

Dated: September 28, 2026

Respectfully submitted,

*/s/ Hunter J. Shkolnik*
Hunter J. Shkolnik
NAPOLI SHKOLNIK
NSPR LAW SERVICES LLC
1302 Avenida Ponce de León
Santurce, PR 00907
Tel: (787) 493-5088
Hunter@nsprlaw.com

*/s/ Shayna E. Sacks*
Shayna E. Sacks
NAPOLI SHKOLNIK PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Tel: (212) 397-1000
SSacks@napolilaw.com

***Counsel for Plaintiff and the Proposed Class***